**UNITED STATES of America, Appellee,**

v.

**Robert HAHN, Defendant, Appellant.**

**No. 93–1858.**

United States Court of Appeals,
First Circuit.

Heard Jan. 5, 1994.

Decided March 9, 1994.

Paul J. Haley, with whom Scott L. Hood and Law Office of Paul J. Haley were on brief for appellant.

David A. Vicinanzo, Assistant United States Attorney, with whom Peter E. Papps, United States Attorney, was on brief for appellee.

Before SELYA, CYR and BOUDIN, Circuit Judges.

CYR, Circuit Judge.

Appellant Robert Hahn challenges various trial court rulings and the sufficiency of the evidence supporting his convictions for using or carrying a firearm in relation to a drug trafficking crime, 18 U.S.C. § 924(c), conspiring to possess and distribute marijuana, 21 U.S.C. § 846, and conducting a continuing

criminal enterprise, 21 U.S.C. § 848(a), (c). Careful review discloses no error.

## I

### BACKGROUND

We recite the relevant facts in the light most favorable to the verdict. *See United States v. Welch*, 15 F.3d 1202, 1212 (1st Cir. 1993). In 1992, Hahn and ten other defendants were jointly indicted in the United States District Court for the District of New Hampshire, as former members of a nationwide marijuana trafficking conspiracy spanning more than a decade and headed by one Alberto "Dad" Lujan. As a principal underboss, Hahn had been responsible for, *inter alia*, transporting smuggled Mexican marijuana from Arizona for distribution in California, Colorado, Michigan, New Hampshire, Massachusetts and New York, among other locales.

In the early 1980s, Hahn and Lujan were local marijuana dealers seeking to penetrate marijuana markets outside Arizona in order to capitalize on their connections with suppliers in Mexico. Eventually, Hahn established a business relationship with Mark Heino, a New Hampshire native living in southern California. Some of the marijuana Heino bought from Hahn, he resold in California. The rest Heino distributed during his frequent trips to New Hampshire. Heino himself became an underboss in the Lujan organization, a position he retained until his arrest on trafficking charges in early 1984.

With Heino out of circulation, the New Hampshire operation was taken over by Hugh Mulligan, another New Hampshire native. Like Heino, Mulligan had been recruited into the Lujan organization by Hahn, who thereafter supervised Mulligan's New Hampshire operation. Later, when the New Hampshire marijuana market softened, Mulligan introduced Hahn to Dennis and P.J. Dougherty, Long Island residents with New Hampshire ties. The Doughertys afforded the Lujan organization access to the lucrative Metropolitan New York marijuana market, and large marijuana shipments were soon being trucked in from Arizona. Several years later, after the Doughertys dropped out of the picture, Hahn established a high-volume marijuana trade with another New York dealer. Meantime, Heino was released from prison in mid–1986, returned to New Hampshire, and reestablished himself in the Lujan organization. During this period, Hahn concentrated on the organization's interests in Arizona, Metropolitan New York, and New Hampshire.

Hahn's primary role was to supervise marijuana shipments from Arizona to New York and New England.[1] In early 1991, Lujan set up a bogus produce-trucking operation as a cover for the marijuana shipments. A professional truck driver, one Roger Bradley, was recruited for the long-haul runs between Arizona and the Northeast. Upon arrival at his East Coast destination, Bradley would contact Hahn to arrange for offloading. Normally, Bradley would "deadhead" back to Arizona, but on occasion he transported large quantities of currency back to Lujan at Hahn's request.[2]

The cross-country trucking operation was a success. At its apex, during 1991 alone,

---

1. Hahn's secondary role was to ensure the security of the organization's marijuana supply in Arizona. Several witnesses testified that Hahn almost always carried a .45 caliber Colt Commander handgun. Coconspirator Michael Sheehan testified that Hahn admitted conducting raids, or "rips," on rival traffickers and stealing their marijuana, thereby impeding the competition. Hahn told Sheehan that he had been wounded by gunfire during a "rip" in Tucson on December 8, 1989. At trial, a police officer testified to having found Hahn in the aftermath of the December 8 shootout, and the government introduced photographs depicting the shootout scene, strewn with bullets and bales of marijuana.

2. The cross-country transportation operation required manpower. The principal truck driver was Bradley, but on at least one occasion coconspirators Michael Sheehan and Jeff Heino, Mark Heino's brother, were brought to Arizona by Hahn to help with the driving. Hahn also recruited his stepson, Craig Nezat, and Nezat's cousin, Robert Mercado, to come to New York to assist with offloading. And, finally, Hahn often used either Jeff Heino, Sheehan, or Ken White, as a helper—to drive and assist in offloading the marijuana. Although Mulligan took a back seat to Mark Heino after the latter was released from prison, on at least one occasion Hahn used Mulligan as a courier for transporting the organization's currency from New York to Arizona.

thirteen to fifteen tractor-trailer loads were transported from Arizona to the Northeast under Hahn's supervision, approximating 5,000 pounds apiece. The criminal conspiracy unravelled shortly thereafter, however. During 1992, Hahn's performance faltered, due apparently to his cocaine habit, and he was cashiered by Lujan. Heino was unable to reestablish a supply line between Arizona and New Hampshire. Finally, Hahn was arrested in Arizona on November 12, 1992.[3]

## II

### DISCUSSION

#### A. *Sufficiency of the Evidence*

##### 1. *Standard of Review* .

The challenges Hahn asserts to the sufficiency of the evidence and to the denial of his motions for judgments of acquittal "raise a single issue." *United States v. Batista–Polanco,* 927 F.2d 14, 17 (1st Cir.1991), *quoted in United States v. Cassiere,* 4 F.3d 1006, 1011 (1st Cir.1993); *see also Welch,* 15 F.3d at 1212. The verdicts are reviewed under well-recognized standards:

> We assess the sufficiency of the evidence as a whole, including all reasonable inferences, in the light most favorable to the verdict, with a view to whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. We do not weigh witness credibility, but resolve all credibility issues in favor of the verdict. The evidence may be entirely circumstantial, and need not exclude every reasonable hypothesis of innocence; that is, the factfinder may decide among reasonable interpretations of the evidence.

*Batista–Polanco,* 927 F.2d at 17 (citations omitted).

**3.** Hahn's ten codefendants entered into plea agreements with the government.

**4.** As the Tenth Circuit explained in *Jenkins:*
[The CCE statute's] use of the indefinite article when describing 'a position of organizer' or 'a supervisory position or **any other** position of

#### 2. *Continuing Criminal Enterprise*

A conviction under 21 U.S.C. § 848 for engaging in a continuing criminal enterprise ("CCE") requires proof beyond a reasonable doubt that the defendant (1) committed a felony drug offense, (2) as part of a continuing series of such violations, (3) in concert with five or more persons in relation to whom he acted as a supervisor, organizer, or manager, (4) and from which multiple operations he realized substantial income or other resources. *See, e.g., United States v. Rouleau,* 894 F.2d 13, 14 (1st Cir.1990). Hahn claims that the government established neither the third nor the fourth element of the CCE offense.

Under the familiar construction accorded the third CCE element, the jury need only have found that the predicate crime was committed in concert with at least five different individuals in relation to whom the defendant served as an organizer, supervisor, or in any other management position. *See* 21 U.S.C. § 848(c)(2)(A); *see also United States v. David,* 940 F.2d 722, 730–32 (1st Cir.1991), *cert. denied sub nom., Toro Aristizabal v. United States,* —— U.S. ——, 112 S.Ct. 605, 116 L.Ed.2d 628 (1991), *and cert. denied sub nom., Yarden v. United States,* —— U.S. ——, 112 S.Ct. 908, 116 L.Ed.2d 809 (1992), *and cert. denied sub nom., Toro Aristizabal v. United States,* —— U.S. ——, 112 S.Ct. 1298, 117 L.Ed.2d 520 (1992), *and cert. denied,* —— U.S. ——, 112 S.Ct. 2301, 119 L.Ed.2d 224 (1992); *United States v. Jenkins,* 904 F.2d 549, 553 (10th Cir.), *cert. denied,* 498 U.S. 962, 111 S.Ct. 395, 112 L.Ed.2d 404 (1990).[4]

The record abounds with evidence that Hahn performed a supervisory role in the Lujan organization which required management of more than five other individuals. First, Hahn concedes that he supervised Craig Nezat and Robert Mercado. Further, there is uncontroverted evidence that he ex-

management' contemplates that a given network may have many persons in authority. Thus, the defendant need not be the dominant organizer or manager of the enterprise; he need only occupy **some** managerial position with respect to five or more persons.
*Jenkins,* 904 F.2d at 553 (emphasis in original).

ercised virtually exclusive managerial control of marijuana transportation between Arizona and the Northeast, which means that truck drivers Roger Bradley, Michael Sheehan and Jeff Heino were under Hahn's control and supervision from time to time as well. Although these five subordinates were enough to establish the third CCE element, Ken White and Hugh Mulligan were managed by Hahn as well. *See supra* at p. 505.[5]

Hahn's challenge to the sufficiency of the evidence on the fourth CCE element is unavailing as well. The "substantial income" requirement may be met either by direct evidence of the revenues realized and resources accumulated by the defendant, or by such circumstantial evidence as the defendant's position in the criminal organization and the volume of drugs handled by the organization. *United States v. Roman,* 870 F.2d 65, 75 (2d Cir.), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989); *United States v. Sisca,* 503 F.2d 1337, 1346 (2d Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). The "substantial income" test establishes no fixed minimum, but is intended "to exclude trivial amounts derived from occasional drug sales," *Roman,* 870 F.2d at 75; *see also United States v. Medina,* 940 F.2d 1247, 1251 (9th Cir.1991) ("The practical meaning of 'substantial income or resources' will normally be a question for the trier of fact").

There is overwhelming circumstantial evidence that Hahn derived "substantial income" from the management services rendered to the Lujan organization. The government need only prove revenue, not profit. *See, e.g., Roman,* 870 F.2d at 75. The sheer scope of the conspiracy, which generated millions of dollars from many tons of marijuana over several years, provided ample basis for a reasonable inference that Hahn realized far more than trivial amounts of income from the organization. *See id.* For example, the trial

testimony indicated that Bradley alone transported approximately 50,000 pounds of marijuana from Arizona to the Northeast and over $1 million in cash from New York to Arizona at Hahn's direction on one occasion alone. Coconspirator Ken White testified that he purchased tens of thousands of dollars worth of automobiles and handguns at Hahn's request. And coconspirator Jeff Heino testified that Hahn typically spent $1,500 to $2,000 per day while Heino was working with him in the field on organization business. The fourth CCE element was established beyond a reasonable doubt.[6]

### 3. *Conspiracy to Possess and Distribute Marijuana*

Next, appellant challenges the sufficiency of the evidence supporting his conviction for conspiring to distribute marijuana, *see* 21 U.S.C. 846, which requires proof beyond a reasonable doubt that "(1) a conspiracy existed, (2) ... the defendant knew of it, and (3) ... he voluntarily participated in it." *David,* 940 F.2d at 735. "A criminal conspiracy is a tacit or explicit agreement to perform an unlawful act or omit one the law requires." *United States v. Penagaricano–Soler,* 911 F.2d 833, 840 (1st Cir.1990), *citing Iannelli v. United States,* 420 U.S. 770, 777, 95 S.Ct. 1284, 1289–90, 43 L.Ed.2d 616 (1975). The illicit agreement may be established by direct and circumstantial evidence. *Batista–Polanco,* 927 F.2d at 19.

Hahn's claim that the government failed to establish an agreement among him and his confederates is frivolous. The evidence undergirding the CCE conviction alone, *see supra* at pp. 506–07, was sufficient to support a jury finding that Hahn conspired with at least seven other persons to distribute marijuana. Beyond that, however, Hahn concedes that he was a "middleman" between "Dad" Lujan and Mark Heino. Finally, the evidence was not nearly so limited, but dem-

---

5. It is therefore unnecessary to address Hahn's argument that he did not control the New Hampshire branch of the Lujan organization. "[S]o long as the record supports a finding that *any* five people were under [the defendant's] control, our task is complete and the status of the other individuals is immaterial." *David,* 940 F.2d at 731 (emphasis in original).

6. Although Hahn's father testified that throughout the period in question his son lived in a trailer behind the family home and was "constantly asking for money," we may not presume the jury incapable of circumspection. *See Batista–Polanco,* 927 F.2d at 17.

onstrated beyond a reasonable doubt that Hahn was a key conspirator in a large-scale marijuana conspiracy involving many other people.

### 4. *Firearms Conviction*

■ Hahn contends that the government did not establish that he "used or carried" a firearm during and in relation to a drug trafficking crime as required by 18 U.S.C. § 924(c). This claim too is without merit. Hahn concedes that "many witnesses testified at trial regarding the fact that the defendant occasionally carried a weapon."[7] Since we will not second-guess credibility determinations by the jury, *id.* at 17, that testimony was sufficient evidence in itself since these weapon-carrying incidents involved activities in direct furtherance of the conspiracy. *See supra* notes 1 & 7.

### B. *Motions for Mistrial*

■ Hahn charges error in the denial of his motions for mistrial based on the government's failure to establish that his involvement in the "rip" shootout in Tucson was in furtherance of the conspiracy. A mistrial need not be allowed absent a clear showing of prejudice. *United States v. Sclamo*, 578 F.2d 888, 891 (1st Cir.1978); *United States v. Pappas*, 611 F.2d 399, 406 (1st Cir.1979). We review the mistrial ruling for "abuse of discretion." *United States v. Dockray*, 943 F.2d 152, 157 (1st Cir.1991).

After the government's opening statement, the defense moved for a mistrial based on the prosecutor's reference to the Tucson "rip." *See supra* note 1. The government represented at sidebar that it would link the Tucson "rip" with the larger conspiracy through the testimony of coconspirator Michael Sheehan. The court accordingly denied the motion for mistrial, without prejudice to its renewal. Sheehan later testified

that Hahn had admitted that he conducted the Tucson "rip" to "knock out the competition." Further, Sheehan testified that Hahn conducted at least one other such raid while Sheehan was in Arizona.

At the close of the government's case, the court ruled the Tucson "rip" evidence admissible as an overt act in furtherance of the conspiracy. Hahn presents no argumentation even remotely suggestive of an abuse of discretion, merely reiterating the unsupported conclusion that the Tucson "rip" was part of a separate conspiracy. The government correctly responds that the jury reasonably could have found otherwise; that is, by intimidating the competition, and stealing their marijuana, Hahn furthered the interests of the Lujan organization.

### C. *Evidentiary Rulings*

Hahn filed a pretrial motion *in limine* to preclude, as irrelevant or unduly prejudicial: (1) testimony of an Arizona state trooper who had made a routine stop of a vehicle being driven by Hahn; and (2) testimony of another officer who searched a different vehicle (subsequently linked with Hahn), and the physical evidence recovered in the ensuing inventory search.

### 1. *Arizona Traffic Stop*

■ Arizona State Trooper Carlos Contreras testified that he encountered Hahn in February of 1992 when he stopped a black Ford pickup truck with New Hampshire license plates because it lacked mud flaps. The driver, Hahn, was in lawful possession of a .45 caliber Colt Commander. The government argued that the traffic-stop evidence was highly probative of the scope of the alleged conspiracy and Hahn's role in it, and that it corroborated important testimony provided by other prosecution witnesses.[8]

---

7. We mention but a few examples. First, coconspirator Craig Nezat testified that Hahn carried a gun during their marijuana-related business trips to New York. Second, coconspirator Ken White testified that he bought more than one dozen guns for Hahn, and that Hahn almost always carried a gun. Finally, when Hahn was found at the December 8, 1989 shoot-out scene, he lay

only inches from a .45 Colt Commander, his signature handgun. *See supra* at note 1.

8. First, it established that Hahn was driving a New Hampshire vehicle in Arizona. Second, the black Ford pickup registration was in Hahn's name, and indicated a dwelling owned by coconspirator Mark Heino as Hahn's New Hampshire address. Third, Ken White had testified to buy-

Hahn argues that the traffic-stop and handgun evidence should not have survived the gauntlet for "other acts" evidence established under Federal Rules of Evidence 403 and 404(b).

> First, the past incident must have some relevance other than to show the defendant's propensity to commit the crime. *United States v. Ferrer–Cruz*, 899 F.2d 135, 137 (1st Cir.1990). Second, even if specially relevant, the danger of prejudice cannot substantially outweigh the probative value of the evidence. *Id.* at 138; Fed.R.Evid. 403.

*United States v. Agudelo*, 988 F.2d 285, 287 (1st Cir.1993); *See United States v. Williams*, 985 F.2d 634, 637 (1st Cir.1993) (similar).

The district court first conducted an *in camera* conference with counsel to delimit Trooper Contreras's testimony, heard the testimony, then found that the testimony forged a relevant link among various regional elements in the Lujan organization. Then, with defense counsel's imprimatur, a firm jury instruction was given to the effect, *inter alia*, that it was lawful for Hahn to possess the handgun.[9]

The court correctly ruled that the challenged "other acts" evidence was not precluded under Rule 404(b)'s absolute bar, which "excludes evidence ... relevant *only* because it shows bad character," *United States v. Ferrer–Cruz*, 899 F.2d 135, 137 (1st Cir.1990) (emphasis in original); *see Williams*, 985 F.2d at 637; all evidence derived from the traffic stop, including the handgun, clearly bore direct relevance to legitimate issues, *see* note 7 *supra*. Furthermore, possession of a licensed firearm is neither a bad act nor indicative of bad character.

ing a black Ford pickup at Hahn's request. Fourth, the Colt Commander .45 bore the same serial number appearing on the bill of sale for a handgun Ken White had purchased at Hahn's request.

9. Immediately after Trooper Contreras's direct examination, the district court instructed the jury as follows:
> Ladies and Gentlemen of the jury, you have heard testimony from this witness about Mr.

Under the required Rule 403 balancing, *see id.,* the "other acts" evidence *itself* posed scant risk of engendering any improper inference of predisposition to possess or use a firearm *unlawfully,* as distinguished from *lawful* access to a particular firearm, a piece of evidence highly relevant to Hahn's involvement and role in the alleged conspiracy and CCE. Whatever "prejudice" resulted by reason of the fact that Hahn was being tried, *inter alia,* on a weapons charge, was not only mitigated by the limiting instruction, *see Huddleston v. United States,* 485 U.S. 681, 691–92, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771, *citing United States v. Ingraham,* 832 F.2d 229, 235 (1st Cir.1987), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988), but did not derive unfairly from the challenged evidence itself. We discern no unfair prejudice and no abuse of discretion.

### 2. *The Lincoln Mark VII*

Hahn attempted to preclude evidence seized from a Lincoln Mark VII abandoned near an airport in Islip, New York. An inventory search yielded, *inter alia,* a .45 caliber Derringer handgun, several Colt .45 caliber ammunition clips, and various travel documents in Hahn's name. Coconspirator Ken White had testified to purchasing an identical Lincoln Mark VII at Hahn's behest, and several witnesses testified that the Lincoln was used by Hahn in his New York City area activities in behalf of the Lujan organization. The Derringer bore a serial number matching that on the bill of sale White received when he purchased it, as he did other handguns, at Hahn's request. Finally, among the travel documents found in the Lincoln was the receipt for a round-trip airline ticket issued in Hahn's name for travel between Tucson and Islip.

Hahn's possession of a firearm in Arizona. The witness has already testified that it was entirely lawful for Mr. Hahn to possess that firearm and the witness's statement is correct and you are to understand from me as my instruction on the law that it was entirely lawful for Mr. Hahn to possess that firearm and you're not to draw any inference against Mr. Hahn because he was in possession of that firearm as testified to by this witness.

Hahn argues that this evidence should have been excluded under Rule 403 because its prejudicial effect outweighed its probative value. The difficulty with Hahn's claim is that he "has not shown that the probative value of the 'other act' evidence was substantially outweighed by its *unfair* prejudice." *United States v. Carty*, 993 F.2d 1005, 1011 (1st Cir.1993) (emphasis in original); *see United States v. Rodriguez–Estrada*, 877 F.2d 153, 156 (1st Cir.1989) ("all evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided"). Although evidence of handgun possession may indeed invite an inference that the defendant *used* the gun, the entirely legitimate *predicate* inference for so concluding is that prior possession makes it "more probable" that the defendant *used* a handgun than would be the case if there were no such evidence. *See* Fed.R.Evid. 401. Thus, no unfair inference of character-based predisposition was necessary to constitute the seized handgun and ammunition probative evidence on several important factual issues, including Hahn's activities in the New York area. As no cautionary instruction was requested, we discern no abuse of discretion.

## D. *Impeachment Evidence*

■ After trial, Hahn's attorney became aware of a plea agreement and a police report relating to government witness Roger Bradley which had not been provided to the defense. Claiming that these documents would have been useful for impeachment purposes, Hahn moved for a new trial. The district court denied the motion.

■ "[T]he district court's determination on the materiality of newly discovered evidence in prosecutorial nondisclosure cases is ordinarily accorded deference." *United States v. Sanchez*, 917 F.2d 607, 618 (1st Cir.1990) (citations omitted), *cert. denied*, 499 U.S. 977, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991). A new trial is in order only if Hahn

can demonstrate a reasonable probability that the result would have been different had the defense been provided the undisclosed evidence before trial. *See Barrett v. United States*, 965 F.2d 1184, 1189 (1st Cir.1992); *Sanchez*, 917 F.2d at 617.

The district court ruled that no such showing had been made by Hahn because: (1) defense counsel had been provided with a plea agreement between Bradley and the United States Attorney for the District of New Hampshire, and had been made aware of the existence of the Arizona plea agreement even though the document itself was not provided; (2) Hahn's counsel made good use of these plea agreements at trial and, indeed, Bradley admitted on cross-examination that he was hoping for a lighter sentence in exchange for his testimony; and (3) the Arizona police report was cumulative, as it contained information previously provided to the defense in other documents, and had been effectively used in cross-examination. Careful review leaves no doubt that these findings were well founded, in law and fact. " 'Impeachment evidence, even that which tends to further undermine the credibility of the key government witness whose credibility has already been shaken due to extensive cross-examination, does not create a reasonable doubt that did not otherwise exist when that evidence is cumulative or collateral.' " *Id.* at 618–19 (*quoting United States v. Shelton*, 588 F.2d 1242, 1248 (9th Cir.1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 275 (1979)).

## E. *Sentencing*

The district court imposed two concurrent life terms for the CCE and conspiracy count convictions, as well as a mandatory, consecutive five-year term for the firearms offense under 18 U.S.C. § 924(c); a $25,000 fine; costs of confinement; and five years' supervised release.[10] In accordance with 18

---

**10.** These sentences were imposed pursuant to the November 1, 1992, version of the Sentencing Guidelines. *See* U.S.S.G. § 1B1.1 (1992). The § 924(c) conviction triggered a mandatory consecutive five-year sentence. *See id.* § 2K2.4. The CCE and conspiracy counts were grouped pursuant to U.S.S.G. § 2D1.5, comment. (n. 4). *See id.* § 3D1.3.

On the conspiracy conviction, the court conservatively calculated the drug quantity at 10,000 to 30,000 kilograms of marijuana, *see id.* § 2D1.1(c)(4), for a base offense level ("BOL") of 36, augmented by a two-level enhancement for possessing a firearm, *see id.* § 2K2.4, comment. (n. 2), and a four-level enhancement for Hahn's

U.S.C. § 3553(c)(1), the district court entered the following statement of reasons for sentencing Hahn at the upper limit of the guideline sentencing range ("GSR"):

1. Hahn was a career criminal who had "devoted his entire life to the business of trafficking in illegal drugs."

2. Hahn used weapons, violence, and intimidation as a day-to-day part of his business operation.

3. Estimated conservatively, the quantity of marijuana attributable to Hahn was well in excess of the 10,000 kilograms necessary to qualify for the offense level found applicable in the pre-sentence report.

4. Hahn managed and corrupted considerably more than five people over the course of the conspiracy.

The only challenge to these findings is directed at the amount of marijuana for which Hahn was held responsible.

The "drug quantity" determination must be based on a preponderance of the evidence, U.S.S.G. § 1B1.3, and we review only for clear error. *United States v. Tracy,* 989 F.2d 1279, 1287 (1st Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 2393, 124 L.Ed.2d 294 (1993). The presentence report recommended that 64,200 pounds of marijuana (approximately 29,000 kilograms) be attributed to Hahn, based in part on the trial testimony of several witnesses who recounted particular transactions during the decade-long period from 1980 to early 1991, augmented by an estimate of the amount transported by Roger Bradley in thirteen tractor-trailer loads during 1991 alone. The court conservatively estimated the total amount at 49,700 pounds for sentencing purposes.

Hahn's challenge is based exclusively on a credibility attack against Bradley's trial testimony. *But see United States v. Sepulveda,* 15 F.3d 1161, 1198 (1st Cir.1993) (where testimony provides competent basis for estimating drug quantity, we need go no further, *id.* at 1200). Not only are the district court findings fully supported, but Hahn does not

allege that he was responsible for less than the 10,000 kilograms of marijuana required to trigger BOL 36. *See* note 10 *supra.* Thus, any alleged discrepancy in weight would be immaterial for guideline sentencing purposes.

*Affirmed.*

---

leadership role, *see id.* § 3B1.1(a), for an adjusted base offense level ("ABOL") of 42.

On the CCE count, the ABOL was 42 as well, *see id.* § 2D1.5, and Hahn's category I criminal

history status resulted in a guideline sentencing range of 360 months to life. *See id.* § 5A (sentencing table).