September 18, 1995 [NOT FOR PUBLICATION]
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT



No. 94-1502

UNITED STATES,
Appellee,

v.

JAIME CATANO,
Defendant - Appellant.



No. 94-1503

UNITED STATES,
Appellee,

v.

MICHAEL MURRAY,
Defendant - Appellant.



No. 94-1504

UNITED STATES,
Appellee,

v.

LEONEL CATANO,
Defendant - Appellant.



No. 94-1505

UNITED STATES,
Appellee,

v.

JAMES MURRAY,
Defendant - Appellant.



APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge] 



Before

Stahl, Circuit Judge, 

Campbell, Senior Circuit Judge, 

and John R. Gibson,* Senior Circuit Judge. 



William A. Brown, by Appointment of the Court, for appellant 
Jaime Catano.
Daniel J. O'Connell III for appellant Michael Murray. 
Robert L. Sheketoff, with whom Sheketoff & Homan was on 
brief for appellant Leonel Catano.
Steven J. Brooks, with whom James P. Duggan, by Appointment 
of the Court, was on brief for appellant James Murray.
George W. Vien, Assistant United States, with whom Donald K. 
Stern, United States Attorney, and Geoffrey E. Hobert, Assistant 
United States Attorney, were on brief for appellee.





 

* Of the Eighth Circuit, sitting by designation.

JOHN R. GIBSON, Senior Circuit Judge. This unpublished JOHN R. GIBSON, Senior Circuit Judge. 

portion of our opinion disposes of those issues which do not have

sufficient precedential value to warrant publication. Therefore,

we incorporate by reference the statement of the case and facts

from the published portion of our opinion of the same date. We

here discuss and affirm the rulings of the district court in:

(1) denying James Murray's suppression motion; (2) denying Jaime

Catano's motion for severance; (3) denying Jaime Catano's motion

to participate in Michael Murray's omnibus motion hearing; (4)

managing the use of peremptory challenges; (5) refusing to define

reasonable doubt; (6) convicting Jaime Catano of continuing

criminal enterprise; and (7) refusing to adjust Michael Murray's

sentence for acceptance of responsibility or to depart downward.

I. JAMES MURRAY'S SUPPRESSION MOTION I. JAMES MURRAY'S SUPPRESSION MOTION 

James Murray argues that the district court erred in

denying his motion to suppress evidence police seized in

warrantless searches of James Murray's pickup truck and a Buick

James Murray had rented. When the agents arrested James Murray

on November 6, 1991, they seized keys to the rented Buick and to

the pickup truck. The Buick was parked at the hotel where they

had arrested James Murray. The pickup was in a parking lot of

the Dallas-Ft. Worth airport. The agents had both vehicles

searched. In the Buick, they found a rental agreement in James

Murray's name, $2,350 in cash, a Smith Corona typewriter and

-3-

twelve telephone books from the Southeastern United States.1 In

the pickup, they found $100,000 cash behind the seat. After an

evidentiary hearing, the district court denied James Murray's

motion to suppress the evidence seized from the Buick and the

pickup.

James Murray argues that the government had to

establish both probable cause and exigent circumstances to

justify the warrantless search of these vehicles, but in this he

is mistaken. Under the automobile exception to the search

warrant requirement, if a motor vehicle is in transit or parked

in a public place, police may search it without a warrant,

relying solely on probable cause. United States v. McCoy, 977 

F.2d 706, 710 (1st Cir. 1992); United States v. Panitz, 907 F.2d 

1267, 1271-72 (1st Cir. 1990).

James Murray argues that there was not even probable

cause, because the agents' suspicions were based on the word of

Roberto L pez, whom the agents knew to be unreliable.

The agents had "probable cause" for the searches if

they had facts to support a "well-founded conclusion 'that an

offense has been committed and . . . sound reason to believe that

a particular search will turn up evidence of it.'" Panitz, 907 

F.2d at 1271 (internal quotation marks and citation omitted). We

review a district court's finding of probable cause on a

 

1 The typewriter and telephone books are relevant in light of
Michael Murray's comments in a video taped conversation with
other conspirators that he would make bills of lading with a
typewriter. 

-4-

suppression motion for clear error. United States v. Zapata, 18 

F.3d 971, 975 (1st Cir. 1994).

Contrary to James Murray's contention, the government's

probable cause does not depend on the word of L pez, but on taped

conversations among the conspirators and observations of the

conspirators' actions after the conversations. From the audio

tape supplied by Nigro, the government knew Michael Murray was

expecting to obtain marijuana from "Mexicans," that the

conspirators were going to Texas for that purpose, and that they

would have money to finance the purchase and transportation

costs. Shortly before Leonel Catano and L pez left in the

tractor-trailer for Texas, the DEA overheard their conversation

with the Murrays, in which they coordinated their respective

duties for the upcoming trip.

By the time they searched James Murray's vehicles, the

DEA agents had seen the conspirators take a number of steps in

accordance with the plans laid out in this video taped

conversation. In the tape, the group agreed to go to the

"crane," and they later went to a crane yard, where they put a

steel tank on their trailer. (There was evidence that the group

had used that tank before to transport marijuana.) In the tape

Michael Murray said that he would get money and Leonel should go

to a truck stop; later that day, aerial surveillance agents saw a

parked sedan (such as Michael Murray was driving) next to

Leonel's truck in the truck area of a highway rest stop. The car

and truck left the rest stop at the same time. In the video tape

-5-

Michael Murray said that James Murray would "go and he's going to

have money to pay the other transportation people up in Dallas;"

three days later, James Murray showed up in McAllen, Texas in a

car rented at the Dallas-Fort Worth airport. In the taped

conversation Michael Murray had instructed L pez and Leonel

Catano to "go to Dallas, drop the box then just come, ah,

bobtail." Leonel Catano and L pez did in fact drop the trailer

off in Luling and "bobtail" to McAllen.

From the taped conversation and subsequent actions of

the parties to that conversation, the government had probable

cause to believe that James Murray was involved in a scheme to

buy marijuana in south Texas and transport it north, and that he

would be carrying a significant amount of money to pay for the

transportation costs. His rental car and his truck were logical

places to look for the money. The district court did not err in

finding probable cause, or in denying James Murray's motion to

suppress.

II. JAIME CATANO'S MOTION FOR SEVERANCE II. JAIME CATANO'S MOTION FOR SEVERANCE 

Jaime Catano argues that the district court erred in

denying his motion to sever. Jaime Catano's argument for

severance is lumped together with his argument for participation

in Michael Murray's omnibus hearing and reads, in its entirety:

[I]t was error for the District Court to
deny Jaime Catano's Motion to Sever.
Michael Murray had cooperated extensively
with the government. There was no way
Jaime Catano's counsel could know that,
in a joint trial, the source of the
government's evidence against him was co-

-6-

defendant Michael Murray. See Bruton v. 
U.S., 391 U.S. 123 (1968). 

Denial of a motion for severance is "committed to the

sound discretion of the trial court, and we review only for a

manifest abuse of discretion resulting in a miscarriage of

justice." United States v. Welch, 15 F.3d 1202, 1210 (1st Cir. 

1993), cert. denied, 114 S. Ct. 1661 (1994). To obtain 

severance, a defendant must show that "'substantial prejudice'

would result from a joint trial." Id. (citation omitted). 

Prejudice in this context requires "more than just a better

chance of acquittal at a separate trial." United States v. 

Mart nez, 479 F.2d 824, 828 (1st Cir. 1973). Jaime Catano has 

shown no substantial prejudice. Further, his reliance on Bruton 

is misplaced. Bruton prevents the admission at a joint trial of 

one co-defendant's extrajudicial statements implicating another

absent the opportunity for cross-examination, 391 U.S. at 135-36,

a situation not presented here. Jaime Catano's three-sentence

argument leaves the issue undeveloped and, therefore, waived.

See United States v. Zannino, 895 F.2d 1, 17 (1st Cir.), cert. 

denied, 494 U.S. 1082 (1990). 

III. JAIME CATANO'S MOTION TO PARTICIPATE III. JAIME CATANO'S MOTION TO PARTICIPATE 

Jaime Catano sought to participate in Michael Murray's

omnibus hearing described in Part I of our published opinion.

Jaime Catano contended that Michael Murray's bargain with the

government would benefit Jaime Catano as well. He argues that

his participation would have allowed him to cross-examine

witnesses as to the benefit which he would receive from his own

-7-

and from Michael Murray's cooperation with the government. He

further argues that he could have "threshed out" discussions

between himself and the DEA and "gleaned" any information the

government learned about him from Michael Murray. At the motion

hearing, Jaime Catano's counsel orally moved the court to

intervene and examine witnesses. The district judge ruled, "I'm

not going to let you examine, but on the other hand, you file a

motion supported by an affidavit and I'll deal with it." The

judge also stated that Jaime Catano had no standing to intervene.

Later, Jaime Catano's counsel again orally moved the court to

participate in the hearing. Again the judge stated, "I told you

to make a motion. I told you to support your motion. You get a

motion. I'll rule on it. . . . But two days have gone by, I have

no motion, the matter is between Mr. Murray and the government."

After the hearing concluded and the trial began, Jaime Catano

served a "Motion for Relief" on the government with a two-page

unsigned affidavit attached which purported to be from Jaime

Catano. The motion asked that the charges against Jaime Catano

be dismissed or, in the alternative, "that the agreement with the

government between Catano, Michael Murray and the other

defendants be enforced." Jaime Catano's "affidavit" alleged that

a DEA special agent contacted him and urged him to cooperate

"which would result in a sentence for me of less than five years

since Michael Murray would get no more than five years for his

sentence." The affidavit also alleged that "when Michael

[Murray] told me that the government wasn't going to give him the

-8-

zero to five year deal after he set up the fentanyl lab, I told

[the special agent] that he was going to have to give Michael and

the rest of us our deal if he wanted me to cooperate." The

affidavit conspicuously fails to allege that Jaime Catano

actually cooperated or detrimentally relied in any way. The

government disputes that this motion and affidavit were ever

filed in the district court. On appeal, Jaime Catano does not

argue that the district court wrongfully denied the motion, only

that the district court wrongfully denied him participation in

Michael Murray's hearing.

This argument fails for two reasons: (1) as discussed

above, Jaime Catano did not timely move the court in writing for

participation in Michael Murray's hearing as the court requested;

and (2) Jaime Catano had no standing to intervene as he had shown

neither an agreement intended to benefit him directly or as a

third-party beneficiary,2 nor any cooperation or detrimental

reliance on his part. See United States v. Lewis, 40 F.3d 1325, 

1332 (1st Cir. 1994) (holding that a criminal defendant is not

entitled to an evidentiary hearing unless he "allege[s] facts

that, if proven, would entitle him to relief"). In short, "[t]o

mandate an evidentiary hearing, the challenger's attack must be

more than conclusory and must be supported by more than a mere

desire to cross-examine." Franks v. Delaware, 438 U.S. 154, 171 

 

2 In fact, Michael Murray's affidavit and the prosecutor's
testimony both indicate that any agreement entered into between
Michael Murray andthe government did not extend to Jaime Catano. 

-9-

(1978) (challenge to the validity of an affidavit supporting a

search warrant). Jaime Catano's attack is neither.

IV. LEONEL CATANO'S OBJECTION TO THE PROCEDURE IV. LEONEL CATANO'S OBJECTION TO THE PROCEDURE 
FOR PEREMPTORY CHALLENGES FOR PEREMPTORY CHALLENGES 

Leonel Catano argues that the district court erred in

its management of peremptory challenges by reconstituting the

venire after Catano had already exercised his peremptory

challenges, without permitting Catano a chance to strike any of

the new veniremen.

The court used a "jury box" system of jury selection.

See generally 8A James Wm. Moore, Moore's Federal Practice 

24.05[1] (2d ed. Feb. 1995 rev.). First, the court asked the

entire venire questions to determine whether there were any

reasons that particular jurors could not be impartial. Several

jurors were excused at this point, so that the venire dwindled to

twenty-seven people. The court announced it would impanel

fourteen people--enough for twelve jurors and two alternates--

then permit each side to make peremptory challenges. The court

would refill the box with new veniremen to replace the challenged

veniremen until both sides had used their challenges or were

satisfied with the panel. The government would have seven

peremptory challenges and the defendants eleven. Fed. R. Crim.

P. 24(b) and (c). The last two jurors to remain unchallenged

would be the alternates. The government exercised four strikes

on the first panel, then the defendants exercised seven. The

court filled the eleven seats left vacant by the strikes with new

veniremen for round two. The defense challenged four of these

-10-

eleven, and the government challenged two. Thus, after two

rounds a total of eight jurors had been selected, and the

defendants had used up all their challenges.

At this point there were not enough remaining veniremen

to refill the jury box. Therefore, the court called the

remaining two veniremen into the box, and the government chose

not to challenge them. Of necessity, the court called for new

veniremen to be brought in from the jury pool. Since the

defendants were out of peremptory challenges and the government

declined to exercise its remaining challenge, all four of these

new veniremen were impaneled. However, the defendants objected

to one of these jurors, arguing that they had no chance to

challenge him. The court replied that the defendants had simply

used up their allotted number of strikes, and that the court

would not allow them extra challenges.

After the jury had been selected, there was a delay

before trial while the court conducted motion hearings. It

happened that during this hiatus the court had to excuse two of

the jurors. It decided to impanel four new alternates, making

the two previous alternates deliberating jurors. The court gave

each side two peremptory challenges to use on this supplementary

jury selection.

Leonel Catano argues that the court's system was

unfair, apparently because he had no opportunity to strike any of

the veniremen in the third round of the regular jury selection

and these included new veniremen not in the original venire. His

-11-

argument is unfounded. The district court has substantial

discretion to regulate the use of peremptory challenges within

the framework of Federal Rule of Criminal Procedure 24(b). See 

United States v. Cox, 752 F.2d 741, 748 (1st Cir. 1985). After 

the initial voir dire and before the court filled the jury box

for the first round, the venire had dwindled to twenty-seven

people. The court announced at the outset that the government

and defendants together would have eighteen peremptory

challenges. Twelve jurors and two alternates were needed.

Simple arithmetic made it apparent at the outset that the court

might have to call more veniremen to get enough for the jury.

The defendants used up their peremptories on the original venire,

without knowing who might walk in the door next. Having created

their own predicament, they have no cause to complain.

Though his argument is unclear, Leonel Catano also

appears to object to the court's procedure when events after the

initial jury selection made it necessary to select more alternate

jurors. The court announced it would give the defendants two

additional challenges because of this new development, but that

the challenges could only be used on newly impanelled jurors, not

those already seated. Leonel Catano argues that the court should

have permitted the use of the new challenges to strike the old

jurors, two of whom were initially designated alternates but now

would be deliberating jurors. The court did not anticipate that

it would be necessary to supplement the jury when the panel was

initially chosen. When unexpected events made it necessary to

-12-

impanel new alternates, there was no reason the court should have

to open up the existing panel to new challenges. This is not a

case like United States v. Sams, 470 F.2d 751, 755 (5th Cir. 

1972), in which the defendant was surprised by an unannounced

rule that prevented him from striking the first group of jurors

in later rounds. Here, the defendants understood the system

initially employed. If the court had not impanelled additional

alternates (which was undoubtedly in its discretion), the

remaining twelve jurors would have deliberated and Leonel Catano

would have no argument. Catano's complaint arises out of the

fact that the court impanelled more alternates out of caution and

Catano wants to benefit from this chance occurrence by using the

new challenges on the old jurors. Catano's argument is

foreclosed by Fed. R. Crim. P. 24(c), which states that the

"additional peremptory challenges [given when the court impanels

alternates] may be used against an alternate juror only." We

will not hamstring the district courts in dealing with

unanticipated events during trial. The district court did not

abuse its discretion in the jury selection process. 

V. LACK OF INSTRUCTION DEFINING "REASONABLE DOUBT" V. LACK OF INSTRUCTION DEFINING "REASONABLE DOUBT" 

The appellants argue that the district court erred in

refusing to instruct the jury on the definition of "reasonable

doubt" in his instructions to the jury. This court has

specifically held that the district court has discretion whether

to define "reasonable doubt". United States v. Cassiere, 4 F.3d 

1006, 1024-25 (1st Cir. 1993); United States v. Olmstead, 832 

-13-

F.2d 642, 644-46 (1st Cir. 1987), cert. denied, 486 U.S. 1009 

(1988). Moreover, we find support for this rule in the Supreme

Court's recent decision in Victor v. Nebraska, 114 S. Ct. 1239, 

1248 (1994). See United States v. Neal, 36 F.3d 1190, 1202-03 

(1st Cir. 1994). If the court instructs that the burden of proof

is "beyond a reasonable doubt," and if the instruction is

prominent, not "buried as an aside," there is no error.

Olmstead, 832 F.2d at 646. The district court instructed on the 

requirement of proof beyond a reasonable doubt many, many times,

and with appropriate gravity and emphasis. There is no error

here.

VI. JAIME CATANO'S CONVICTION FOR CONTINUING CRIMINAL ENTERPRISE VI. JAIME CATANO'S CONVICTION FOR CONTINUING CRIMINAL ENTERPRISE 

Jaime Catano attacks his conviction for continuing

criminal enterprise on the grounds that the court did not

properly instruct the jury on the elements of CCE and that there

was insufficient evidence to convict him.

A. Jury Instruction A. Jury Instruction

Jaime Catano contends that the district court failed to

properly state the elements of the continuing criminal enterprise

count against him in that it failed to state that the continuing

series of crimes committed by the defendant must be "related."3
 

3 The court's CCE instruction stated in relevant part: 

In order for Mr. Jaime Catano to be found
guilty of a continuing criminal
enterprise, the government must prove
five things beyond a reasonable doubt.

First, that Mr. Jaime Catano
committed the offenses of conspiracy,

-14-

Jaime Catano concedes that the standard of review is plain error,

since he failed to object at trial.

The instruction comported with the statutory CCE

requirement as it has been defined in this circuit. See United 

States v. Chagra, 653 F.2d 26, 27-28 (1st Cir. 1981), cert. 

denied, 455 U.S. 907 (1982). Jaime Catano's citation of Garrett 

v. United States, 471 U.S. 773 (1985), does not convince us that 

the Supreme Court has found an additional requirement in the

statute. Other circuits have used the "related" language without

discussion. See, e.g., United States v. Phillips, 664 F.2d 971, 

1013 (5th Cir. 1981), cert. denied, 457 U.S. 1136 (1982); United 

States v. Jones, 801 F.2d 304, 307 (8th Cir. 1986). However, the 

lack of controlling authority and the fact that the predicate

crimes here were shown by overwhelming evidence to be related

anyway, makes it impossible for us to find plain error resulting

in a miscarriage of justice.

B. Sufficiency of Evidence B. Sufficiency of Evidence

Jaime Catano also contends that the government

presented insufficient evidence to convict him on the CCE count.

To convict Jaime Catano for engaging in a continuing criminal
 

possessing marijuana with intent to
distribute it, and attempted possession
of marijuana with intent to distribute
it, all as charged, for the counts that
charge him, in Counts 1, 2, 3 and 5.

Second, that these offenses were
part of three or more offenses committed
by Mr. Jaime Catano over a definite
period of time in violation of the
federal narcotics laws. . . .

-15-

enterprise, the government must prove beyond a reasonable doubt

that he: (1) committed a felony drug offense, (2) as part of a

"continuing series of violations," (3) "in concert with five or

more other persons" whom Jaime Catano organized, supervised, or

otherwise managed, (4) and from which he obtained "substantial

income or resources." 21 U.S.C. 848(c) (1988); United States 

v. Hahn, 17 F.3d 502, 506 (1st Cir. 1994). Jaime Catano contends 

only that insufficient evidence existed to satisfy the

"substantial income" requirement.4 

On a sufficiency of the evidence claim, we view the

evidence in the light most favorable to the verdict. United 

States v. Torres-Maldonado, 14 F.3d 95, 100 (1st Cir.), cert. 

denied, 115 S. Ct. 193 (1994). The substantial income 

requirement is intended "to exclude trivial amounts derived from

occasional drug sales," United States v. Roman, 870 F.2d 65, 75 

(2d Cir.), cert. denied, 490 U.S. 1109 (1989) (citation and 

internal quotation marks omitted), quoted in Hahn, 17 F.3d at 

507, and may be proven directly (by evidence of revenue and

resources) or circumstantially (by evidence of Jaime Catano's

role in the conspiracy and the volume of drugs the conspiracy

handled). Hahn, 17 F.3d at 507. The evidence "need not exclude 

every reasonable hypothesis of innocence; that is, the factfinder

may decide among reasonable interpretations of the evidence."
 

4 Jaime Catano appeals both the denial of his motion for
judgment of acquittal and the sufficiency of the evidence
supporting his conviction. These challenges "raise a single
issue," United States v. Batista-Polanco, 927 F.2d 14, 17 (1st 
Cir. 1991); we address them as one. 

-16-

United States v. Batista-Polanco, 927 F.2d 14, 17 (1st Cir. 1991) 

(citations omitted); Hahn, 17 F.3d at 506. 

Here, the conspiracy involved tons of marijuana, lasted

several years, and generated millions of dollars.5 The scale of

the proven conspiracy along with Jaime Catano's uncontested role

in it "provides ample basis for a reasonable inference that

[Jaime Catano] realized far more than trivial amounts of income"

from his involvement. Hahn, 17 F.3d at 507. 

VII. MICHAEL MURRAY'S SENTENCE VII. MICHAEL MURRAY'S SENTENCE 

Michael Murray argues that the district court erred in

sentencing him because: (1) the court did not order an offense

level decrease for his acceptance of responsibility under USSG

3E1.1 (Nov. 1993); and (2) the court did not order specific

performance of the government's "promise" in the plea offer to

depart downward for his alleged cooperation.

A. Acceptance of Responsibility A. Acceptance of Responsibility

The sentencing court has great discretion in deciding

whether to grant an adjustment for acceptance of responsibility,

United States v. Ruiz, 47 F.3d 452, 455 (1st Cir. 1995), because 

"[t]he sentencing judge is in a unique position to evaluate a

defendant's acceptance of responsibility." USSG 3E1.1,
 

5 Witnesses at trial detailed the transportation and
distribution of six loads of marijuana from Texas to Boston over
a three year period. Richard Baker described stashing and later
retrieving a large gym bag stuffed with ten and twenty dollar
bills. He then left Murray and Jaime Catano alone for
approximately half an hour, after which Michael Murray and Jaime
Catano drove away with the bag and its contents. Other witnesses
testified that the DEA seized $1,149,650 from the tractor-trailer
used in the conspiracy. 

-17-

comment. (n.5). We review that evaluation for clear error.

Ruiz, 47 F.3d at 455. See USSG 3E1.1, comment. (n.5) 

(sentencing judge entitled to "great deference on review").

Guideline section 3E1.1 serves two purposes: to

recognize sincere remorse and to reward a defendant for saving 

the government the trouble and expense of proceeding to trial.

Ruiz, 47 F.3d at 455; USSG 3E1.1, comment. (n.2). The 

guideline commentary notes that "[i]n rare situations," a

defendant can proceed to trial and receive a reduction under 

section 3E1.1. USSG 3E1.1, comment. (n.2). For example, a

defendant may receive a reduction after going to trial "to assert

and preserve issues that do not relate to factual guilt (e.g. to 

make a constitutional challenge to a statute or a challenge to

the applicability of a statute to his conduct)." Ruiz, 47 F.3d 

at 455. Here, however, Michael Murray did not plead guilty, but

rather tried his case "on the basis of reasonable doubt," Michael

Murray's Br. at 42, thus contesting his factual guilt. We will

generally sustain a district court's refusal to grant a reduction

for acceptance of responsibility when the defendant does not

plead guilty. Ruiz, 47 F.3d at 456. We do so here. 

B. Substantial Assistance B. Substantial Assistance

Michael Murray next argues that the district court

erred in denying his request for a downward departure due to his

substantial assistance to the government. USSG 5K1.1, p.s.

(Nov. 1993). He contends that either the government should be

compelled to file a 5K1.1 motion because of his actual

-18-

assistance, or that the district court should have deemed such a

motion filed despite government inaction. Both arguments fail.

Section 5K1.1 conditions departure upon a government

motion. This condition "gives the Government a power, not a

duty, to file a motion when defendant has substantially

assisted." Wade v. United States, 504 U.S. 181, 185 (1992). See 

United States v. Raineri, 42 F.3d 36, 44 (1st Cir. 1994) (holding 

that because a 5K1.1 motion is discretionary, "the government may

choose to insist on quite a lot of assistance if it wants to do

so"), cert. denied, 115 S. Ct. 2286 (1995). Absent a 

"substantial threshold showing" of unconstitutional governmental

motive for refusal to file a 5K1.1 motion, "a claim that a

defendant merely provided substantial assistance will not entitle

a defendant to a remedy." Wade, 504 U.S. at 186. Michael Murray 

has alleged no unconstitutional motive and is not entitled to a

remedy for the government's refusal to file a 5K1.1 motion.

Finally, Michael Murray argues that his assistance to

the government was to a degree "not adequately taken into

consideration by the Sentencing Commission." USSG 5K2.0, p.s.

(Nov. 1993). We have held that "it is theoretically possible,

albeit unlikely" that substantial assistance would be an

extraordinary mitigating circumstance within the ambit of section

5K2.0. United States v. Romolo, 937 F.2d 20, 25 (1st Cir. 1991). 

However, this is not "the rare case where governmental

intractability in the face of overwhelming evidence of enormously

fruitful cooperation might fairly be said to have deprived a

-19-

defendant of his due." United States v. La Guardia, 902 F.2d 

1010, 1018 (1st Cir. 1990) (refusing to depart downward under

section 5K1.1 although defendants cooperated where government did

not file motion). In sentencing Michael Murray, the district

court recognized its authority to depart below the guideline

range, but declined to do so. That decision is not appealable.

United States v. Field, 39 F.3d 15, 21 (1st Cir. 1994), cert. 

denied, 115 S. Ct. 1806 (1995). 

-20-