<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 97-2002

                         UNITED STATES,
                           Appellee,

                               v.

                MIGUEL RODRIGUEZ, A/K/A NEGRITO,
                     Defendant, Appellant.

                      ____________________

No. 97-2003

                         UNITED STATES,
                           Appellee,

                               v.

                         JOHN ROSARIO,
                     Defendant, Appellant.

                      ____________________

No. 97-2004

                         UNITED STATES,
                           Appellee,

                               v.

                        HECTOR FAMANIA,
                 A/K/A DILENGE, A/K/A TALINGE,
                     Defendant, Appellant.

                      ____________________

         APPEALS FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

         [Hon. Richard G. Stearns, U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

                 Bownes, Senior Circuit Judge,

                   and Lynch, Circuit Judge.

                     _____________________

   Michael P. Doolin for appellant Miguel Rodrguez.
   James B. Krasnoo, by appointment of the Court, with whom
Richard Briansky and Law Offices of James Krasnoo, were on brief,
for appellant John Rosario.
   Michael J. Liston, by appointment of the Court, with whom Carr
& Liston, was on brief, for appellant Hctor Famania.
   Demetra Lambros, Attorney, U.S. Department of Justice, with
whom Donald K. Stern, United States Attorney, and George W. Vien,
Assistant United States Attorney, were on brief, for appellee.

                      ____________________

                       December 7, 1998
                      ____________________

         TORRUELLA, Chief Judge. Following a jury trial,
appellants Miguel Rodrguez, John Rosario, and Hctor Famania were
convicted of conspiracy to distribute cocaine base, in violation of
21 U.S.C.  846.  Rodrguez was additionally convicted on three
counts of possession with intent to distribute cocaine base, in
violation of 21 U.S.C.  841(a)(1), and of engaging in a continuing
criminal enterprise, in violation of 21 U.S.C.  848.  On appeal,
the defendants raise numerous issues among which are the lack of
sufficient evidence to convict and abuse of prosecutorial
discretion.  For the following reasons, we affirm the convictions
and sentences.
                           BACKGROUND
         We review the facts of a criminal case on appeal from a
conviction in the light most favorable to the verdict.  See United
States v. Gonzlez-Maldonado, 115 F.3d 9, 12 (1st Cir. 1997).  We  
sketch the facts presented at trial, providing further details as
they become relevant to the discussion.
         This case concerns a crack cocaine distribution ring in
Framingham, Massachusetts.  Through a joint investigation conducted
by the Drug Enforcement Administration ("DEA") and the Framingham
police during 1994 and 1995, a drug-trafficking operation in the
Framingham community known as "Beaver Park" came to light.  At the
helm of the operation was Miguel Rodrguez.  Among his lieutenants
were John Rosario and Hctor Famania.
         The operation worked in the following manner.  An
individual known as "Johnny" would cook powder cocaine into crack.  
Rosario and Famania would then cut, measure, and package the drugs
at Rodrguez's direction. Typically, a prospective drug purchaser
would contact Rodrguez to place an order.  When the customer came
to obtain her drugs, Rodrguez would direct her to one of his
distributors -- Famania, Rosario, Jos Villafae, Pedro De Jess,
Luis Torres, and others.
         Famania and Rosario acted as Rodrguez's lieutenants. In
addition to cutting and packaging the crack for distribution, they
served as liaisons between Rodrguez and would-be distributors.  
Both regularly sold crack in Beaver Park.  
         Famania sold Rodrguez-supplied crack out of his
apartment.  One customer, Juan Carvajal, visited Famania's
apartment on numerous occasions throughout 1995.  Carvajal
witnessed Famania sell $20 bags of crack daily to various
customers, and twice saw Rodrguez give Famania an ounce of crack
for distribution.  On two occasions, Famania supplied Carvajal with
an ounce of crack.   
         Rosario also sold Rodrguez-supplied crack.  Upon
collecting payment from a prospective buyer, Rosario would spit a
plastic bag containing the crack onto the ground, where it would be
retrieved by the purchaser.  
    In January 1995, Rodrguez subordinate Pedro De Jess
made a crack sale to Angela Aurelio -- who, unbeknownst to him, was
an undercover police officer.  The ounce of crack was supplied by
Rodrguez and delivered by De Jess to the officer in her vehicle.  
She paid $950 for the ounce of crack.  A couple of weeks later,
Officer Aurelio made another undercover buy from De Jess.  This
time, Aurelio paid De Jess $1000 for an ounce.
    Investigators also employed Alicia Ellerbee, one of
Rodrguez's regular customers, to make controlled buys.  On
July 10, 1995, Ellerbee met Rodrguez at Beaver Park and placed an
order for an ounce of crack.  Later that day, at a pre-arranged
place, Rodrguez drove up to Ellerbee.  Upon giving him $900,
Ellerbee was directed to the passenger seat of Rodrguez's car,
where a baggie covered by a piece of paper had been placed.  
Ellerbee took the baggie and paper, which she subsequently handed
over to the authorities.  Inside the paper, a Boston Globe
subscription card carrying the name and address of Famania, was a
baggie of crack.
    On July 27, 1995, Ellerbee again made a crack purchase
from Rodrguez at the DEA's direction.  After she ordered the crack
from Rodrguez in the park, Rodrguez walked over to Jos
Villafae. Villafae left, and Ellerbee gave Rodrguez $900.  
Villafae then returned and dropped a package of crack into
Ellerbee's lap.
    On September 13, 1995, the grand jury indicted Rodrguez,
De Jess, and Villafae, charging all the defendants with
conspiracy to distribute cocaine and violations of substantive drug
offenses.  On December 22, 1995, the grand jury returned a seven
count superseding indictment. Count I charged Rodrguez, De Jess,
Villafae, Rosario, Famania, Carvajal with conspiracy to distribute
cocaine base. Count II charged Rodrguez and De Jess with
possession of cocaine base with intent to distribute on January 26,
1995 and aiding and abetting. Count III charged De Jess with
possession of cocaine base with intent to distribute on
February 10, 1995.  Count IV charged Rodrguez with possession of
cocaine base with intent to distribute on July 10, 1995.  Count V
charged Rodrguez and Villafae with intent to distribute on
July 27, 1995 and aiding and abetting.  Count VI charged Rodrguez
with engaging in a continuing criminal enterprise.  Count VII
sought the criminal forfeiture of Rodrguez's Suzuki Samurai and
Nissan Maxima.
    Carvajal, De Jess, and Villafae pled guilty and were
sentenced to terms ranging from time served to sixty months.  
Rodrguez, Famania, and Rosario proceeded to trial, and were
convicted on all counts. Rodrguez was sentenced to life
imprisonment, Rosario to 262 months imprisonment, and Famania to
235 months imprisonment.
                           DISCUSSION
I.  Continuing Criminal Enterprise Conviction
    A conviction under 21 U.S.C.  848 for engaging in a
continuing criminal enterprise ("CCE") requires proof beyond a
reasonable doubt that the defendant: (1) committed a felony drug
offense; (2) as part of a continuing series of such violations; (3)
in concert with five or more persons in relation to whom he acted
as a supervisor, organizer, or manager; and (4) from which multiple
operations he realized substantial income or other resources.  
United States v. Hahn, 17 F.3d 502, 506 (1st Cir. 1994).  In
challenging his conviction, Rodrguez attacks the sufficiency of
the evidence on the latter two elements.  Neither contention has
merit.
    One who challenges the sufficiency of the evidence bears
a heavy burden:  he must show that no rational jury could have
found him guilty beyond a reasonable doubt.  See United States v.
Fulmer, 108 F.3d 1486, 1492 (1st Cir. 1997).  We review the
sufficiency of the evidence as a whole, in a light most favorable
to the verdict, taking into consideration all reasonable
inferences.  See United States v. Scantleberry-Frank, No. 97-2392,
slip. op. at 10 (1st Cir. Oct. 23, 1998).  We resolve all
credibility issues in favor of the verdict.  See id.  The evidence
may be entirely circumstantial, and need not exclude every
hypothesis of innocence; that is, the factfinder may decide among
reasonable interpretations of the evidence.  See id. at 10-11
(citation omitted).
    A.  Organizer, Supervisor or Manager under CCE
    To be an organizer, supervisor or manager within the
meaning of the CCE, the defendant "need not be the dominant
organizer or manager of the enterprise; he need only occupy some
managerial position with respect to five or more persons."  United
States v. Hahn, 17 F.3d 502, 506 n.4 (1st Cir. 1994).  Further, the
jurors are not required to agree on the particular identities of
the subordinates, but must only agree that there were at least five
doing his bidding.  See United States v. David, 940 F.2d 722, 731
(1st Cir. 1991).
    Rodrguez concedes that he organized, supervised or
managed four individuals:  Rosario, Famania, Villafae, and De
Jess.  See Def. Br. at 31.  Contrary to his claim, the government
has presented sufficient evidence as to a fifth individual.
        De Jess, testified that, like him, "Peto" also worked
for Rodrguez.  See Tr. 10/17 at 11-12.  The relevant testimony is
as follows:
        Q: Did you ever see Miguel Rodrguez give  
           drugs to Peto?
        A: (Through the Interpreter) Yes.
        Q: Where did you see those transactions
           take place?
        A: (Through the Interpreter) At the house,  
           Peto's.
                            . . .  
        Q: Did you see what Peto did with the money
           he made from the drugs?
        A: (Through the Interpreter) He would also  
           give it to Miguel.

Tr. 10/17 at 12-13.
        The jury was entitled to find that "Peto" was within
Rodrguez's sphere of influence and subject to his supervision in
the course of his drug trafficking activities.
        B.  Substantial Income from the Enterprise
        The "substantial income" requirement may be met either by
direct evidence of the revenues realized and resources accumulated
by the defendant, or by such circumstantial evidence as the
defendant's position in the criminal organization, and the volume
of drugs handled by the organization.  See Hahn, 17 F.3d at 507.  
The substantial income test establishes no fixed minimum, but is
intended to exclude trivial amounts derived from occasional drug
sales.  See id. (citation omitted).
        There is overwhelming evidence that Rodrguez derived
substantial income from the management of his drug activities.  The
government need only prove revenue, not profit.  See id.  Rodrguez
himself spends over three single-spaced pages of his brief
cataloging trial testimony concerning his drug-trafficking activity
during the indictment period, see Def. Br. at 23-26, and admits
that testimony indicates that he sold or oversaw the sale of
approximately $70,000 worth of drugs during the period of the
conspiracy.  See id. at 23.  To argue that his activities
constitute trivial amounts derived from occasional drug sales is
disingenuous.  The substantial income element of the CCE was
established beyond a reasonable doubt.
II.  Evidentiary Rulings
        Rosario argues that the district court erred in making
evidentiary rulings regarding: (1) testimony about his involvement
in beating a suspected informant; and (2) an eye-witness account of
one of his drug transactions.  Famania challenges the admission of
a Boston Globe subscription card bearing his name and address that
was wrapped around a package of crack sold by Rodrguez to
informant Ellerbee.
        We review the district's court determination to admit
evidence for abuse of discretion.  See United States v. Houlihan,
92 F.3d 1271, 1297 (1st Cir. 1996), cert. denied, 117 S. Ct. 963
(1997).  Only in a rare, extraordinary, and compelling instance
will we, "from the vista of a cold appellate record, reverse a
district court's on-the-spot judgment concerning the relative
weighing of probative value and unfair effect."  David, 940 F.2d at
737 (internal quotations and citations omitted).  None of the
defendants' claims approaches such a circumstance.
        A.  Evidence of Rosario's Violent Acts
        In the summer of 1995, an unidentified man approached
Rodrguez, Rosario, and "Joe" at Beaver Park and asked for drugs.  
Rodrguez, suspicious that the man was an informant, told him to
get "out of my face because you're going to get your butt kicked."  
Tr. 10/16 at 29.  When the man insisted on purchasing drugs,
Rosario reiterated the threat.  When the man failed to leave,
Rosario "just whacked him," id., according to an eye witness.  
Rodrguez and Joe escalated the brawl, and all three punched,
kicked, and yelled at the man.  After the man left the scene,
Rosario and Rodrguez concluded that the man was "one of those rats
. . . one of those guys that work for the cops, . . . giv[ing]
[drugs] to the cops so we get busted for it."  Id. at 30.
        Rosario argues that the fight had "no connection" to the
crack distribution conspiracy, and that a "[r]efusal to sell drugs
to one with whom one fights" frustrated, rather than furthered, the
objectives of the conspiracy.  See Def. Br. at 32-33.  This is an
artful, but incorrect interpretation of the evidence.  This was not
an attempt by Rodrguez and Rosario to prevent a drug transaction.  
Rather, the evidence shows an attempt to set a tone for their drug-
trafficking operation: that suspected informants would be dealt
with harshly.  As the district court found:
        [The beating] was part of a campaign of
        intimidation, to further the interest of the
        conspiracy in maintaining discipline in its
        ranks, by treating anyone suspected of being
        an informant with hostility.

Tr. 10/16 at 134.
        Rosario's violence against a suspected informant is
relevant to prove his membership in the conspiracy and his
acceptance of its objectives.  See David, 940 F.2d at 737 (evidence
of threats and violent acts in aftermath of cocaine theft is
admissible to prove defendant's role in a drug-trafficking
conspiracy).
        Contrary to Rosario's claim, the evidence of the beating
does not stand alone as proof of his membership in the conspiracy.  
This is not a case of guilt by association.  In addition to his
discussion with Rodrguez about how to deal with suspected
informants, four witnesses testified that they either saw Rosario
selling drugs and/or purchased drugs directly from him.  One
witness testified that Rosario delivered an "eight ball" of crack
to him on consignment, explaining the terms of repayment to
Rodrguez.  Another witness testified that she saw Rosario cut and
package large amounts of crack along with Famania.  Consequently,
Rosario's participation in the conspiracy was established beyond a
reasonable doubt.
        B.  Testimony Regarding Rosario's Drug Dealing
        Alicia Ellerbee testified that she saw Rosario give a
customer drugs -- by spitting a baggie holding crack onto the
ground -- in exchange for money.  Rosario's primary challenge to
this evidence is that Ellerbee failed to provide a temporal
proximity as to when these events occurred, and thus the testimony
should have been excluded under Fed. R. Evid. 404(b).  See Def. Br.
at 36.
        A close reading of the record reveals no such defect.  
The witness dated the event between the summer of 1994 and
September 1995, see Tr. 10/10 at 88-89, and, more specifically, at
around May of 1995.  See id. at 89.  The drug transaction fell
squarely within the time frame of the charged conspiracy.
        Further, Rosario argues that "[s]ince the direct evidence
against the Defendant is of such a tenuous nature, any fact
directly linking the Defendant to the sale of crack would be
extremely prejudicial."  Def. Br. at 37.  Aside from the obvious,
that "[b]y design, all evidence is meant to be prejudicial," United
States v. Rodrguez-Estrada, 877 F.2d 153, 155 (1st Cir. 1989),
there is more than sufficient evidence establishing that Rosario
was a distributor and member of the Rodrguez drug-trafficking
organization.  Rosario's argument here is part and parcel of his
guilt by association theory: that he was not a co-conspirator, but
a friend of Rodrguez's with the misfortune of continually being in
the wrong place at the wrong time when drugs were present.  This
argument was presented to the jurors, and rejected by them.  There
is no reason to quarrel with their verdict.
        Finally, Rosario claims that the court "exacerbated [the]
prejudice,"  Def. Br. at 38, of Ellerbee's testimony by foreclosing
cross-examination into her attempted suicide and an incident in
which she supposedly tried to burn her hair.  The district court
properly found that the evidence was not relevant either to her
ability to tell the truth or to her partiality.
        C.  Famania and the Boston Globe Subscription Card
        Alicia Ellerbee made a controlled purchase of crack from
Rodrguez on July 10, 1995.  After negotiating the terms in Beaver
Park, Ellerbee and undercover DEA Agent Russell met Rodrguez near
his home.  From the driver's side of his blue Honda, Rodrguez
directed Ellerbee to the passenger seat, from where she retrieved
a package wrapped in paper.  Ellerbee testified that she gave the
package directly to Agent Russell, and that the two then
rendezvoused with DEA Agent Farley, who took the package from
Russell.  Farley testified that he received the package -- a baggie
of crack wrapped in a Boston Globe subscription card bearing
Famania's name and address -- within five minutes of the
transaction between Ellerbee and Rodrguez.  The subscription card
was admitted into evidence through Agent Farley, who testified that
it was in the same condition as it was when he received it from
Agent Russell.
        Famania argues that the card and Farley's testimony were
admitted in violation of Fed. R. Evid. 602, which requires that a
witness have personal knowledge about the matter to which he
testifies.
        Evidence is inadmissible under Rule 602 "only if in the
proper exercise of the trial court's discretion it finds that the
witness could not have actually perceived or observed that which he
testified to."  United States v. Neal, 36 F.3d 1190, 1206 (1st Cir.
1994), cert. denied, 117 S. Ct. 519 (1996) (citation omitted).  
Personal knowledge can include "inferences and opinions, so long as
they are grounded in personal observations and experience."  Id.(citation omitted).
        Here, Agent Farley testified that he personally received
the drugs, wrapped in the subscription card, from Agent Russell
five minutes after the transaction between Ellerbee and Rodrguez.  
Indeed, on cross-examination, Farley acknowledged that he did not
personally view the transaction between Ellerbee and Rodrguez, and
that he did not see the card when Ellerbee picked it up, or know
the precise configuration of the card at the time of the
transaction with Rodrguez.  As a result, Farley's testimony was
based on his personal knowledge, and is therefore admissible under
Fed. R. Evid. 602.
        Famania's argument with respect to the subscription card
is essentially a complaint about the chain of custody.  He contends
that "[t]here was no evidence that Agent Farley or Agent Russell
signed the card at the time of the transaction or otherwise secured
it as evidence."  Def. Br. at 9.  His concern is that there was no
evidence as to what Agent Russell did with the card in the five
minutes that transpired before he met with Agent Farley.
        A possible defect in the chain of custody for a certain
piece of evidence factors into the weight given to the evidence
rather than its admissibility.  See United States v. Abreu, 952
F.2d 1458, 1467 (1st Cir. 1992).  A defendant can attempt to cast
doubt on an exhibit's authenticity.  Such an issue, however, is to
be resolved by the jury, and not the judge.  Thus, the subscription
card was properly admitted into evidence.
III.  Jury Instruction
        Rodrguez contends that the district court's jury
instructions understated the government's constitutional burden of
proving his guilt beyond a reasonable doubt.  After a close reading
of the instructions, we find no such error.
        Our review of the instructions is de novo.  Gilday v.
Callahan, 59 F.3d 257, 260 (1st Cir. 1995), cert. denied, 516 U.S.
1175 (1996).  The constitutional inquiry is whether "there is a
reasonable likelihood that the jury understood the instruction to
allow conviction based on proof insufficient to meet the
[reasonable doubt] standard."  Vctor v. Nebraska, 511 U.S. 1, 6
(1994).  The challenged remark must be examined along with the rest
of the charge to see, if taken as a whole, the instructions
correctly convey the concept of reasonable doubt to the jury.  Seeid.

        A.  The "Real Possibility" Instruction
        One of the cornerstones of the criminal trial is that the
government must prove beyond a reasonable doubt every element of
the offense.  See In re Winship, 397 U.S. 358 (1970).  The term
"beyond a reasonable doubt" is one of the most bandied, but perhaps
least precisely defined phrases in criminal law.  Here, the trial
judge used a modified version of the Federal Judicial Center form
book instruction for "beyond a reasonable doubt."  Below is the
instruction as given, underlined to show the part we discuss:
          In a criminal case the burden of proving
        guilt is on the government.  It has that
        burden throughout the entire trial.  A
        defendant never has to prove his innocence.  
        The right of a defendant to put the government
        to its proof is one of the most fundamental
        guarantees of our Constitution.  It means that
        the defendant has no obligation to produce any
        evidence or to testify.  Thus, you may not
        draw an inference of guilt from the fact that
        a defendant did not testify.  You may not even
        discuss that fact in your deliberations.  
        Again, the burden rests solely upon the
        government to prove a defendant guilty beyond
        a reasonable doubt.
          Now, what is proof beyond a reasonable
        doubt?  The term is often used, and probably
        pretty well understood intuitively, although
        it is not easily defined.  Proof beyond a
        reasonable doubt does not mean proof beyond
        all possible doubt or proof to a mathematical
        certainty. Everything in our common experience
        is open to some possible or imaginary doubt.  
        It does, however, mean that the evidence must
        exclude any reasonable doubt as to a
        defendant's guilt.
          A reasonable doubt may arise not only from
        the evidence produced but also from the lack
        of such evidence.  A reasonable doubt exists
        when, after weighing and considering all the
        evidence in the case, using your reason and
        common sense, you cannot say that you have a
        firm and settled conviction that the charge is
        true.
          It is not enough for the government to
        establish a probability, even a strong
        probability, that a defendant is more likely
        guilty than not.  That is not enough.  Proof
        beyond a reasonable doubt must be proof of
        such a convincing character that you can,
        consistent with your oath as jurors,
        conscientiously base your verdict upon it.  If
        you so find as to a defendant, you will return
        a verdict of guilty.  On the other hand, if
        you think there is a real possibility that the
        defendant is not guilty of the charges, you
        must give the defendant the benefit of that
        doubt and find him not guilty.

Tr. 10/21 at 108-09.  The challenged sentence in this instruction
is substantially copied from the Federal Judicial Center form book.  
See Federal Judicial Center, Pattern Criminal Jury Instructions 28
(1988) (Instruction 21).
        Rodrguez's argument is directed at the phrase "real
possibility" in the sentence, "On the other hand, if you think
there is a real possibility that the defendant is not guilty, you
must give him the benefit of the doubt and find him not guilty."  
He argues that the trial judge equated reasonable doubt with "real
possibility."  Rodrguez contends that the district court
exacerbated an already bad situation when it further explained that
the jury could draw inferences using "reason and logic" and "in
light of reason and common sense."  He claims that worse still, the
district court then failed to give an instruction stating that the
standard for drawing an inference is not the same as the standard
for finding guilt, thus creating a reasonable likelihood that the
jury would apply an impermissibly low standard of proof to the
government's case against the defendants.
        The Supreme Court has held that a reasonable doubt is, at
a minimum, one based on reason, so "[a] fanciful doubt is not a
reasonable doubt."  Vctor, 511 U.S. at 17.  Vctor makes that
distinction in the context of approving the phrase "not a mere
possible doubt."  Id.
        "[T]he Constitution does not require that any particular
form of words be used in advising the jury of the government's
burden of proof."  Id. at 5. The challenged passage from the
Federal Judicial Center form book instruction is recommended by
Justice Ginsburg in her concurrence in Vctor.  See id. at 26-27
(Ginsburg, J., concurring).  The trial judge may require a "real
possibility" of doubt because "[a] fanciful doubt is not a
reasonable doubt."  Id. at 17.  The phrase "real doubt" does not
suffer the infirmity of requiring the jury to have "grave
uncertainty," "substantial doubt," and a "real tangible substantial
basis" for doubt, before they can acquit, as the unconstitutional
instruction did in Cage v. Louisiana, 498 U.S. 39, 40 (1990),
overruled on other grounds by Estelle v. McGuire, 502 U.S. 62, 72
n.4 (1991).
        Here, the likelihood of juror confusion or mistake is
extremely remote.  We conclude that the instructions overall left
the jury with an accurate impression of the presumption of
innocence and of the substantial burden faced by the prosecution in
establishing the defendant's guilt beyond a reasonable doubt.  
There was nothing improper with either the challenged sentence or
the instructions as a whole.
IV.  Brady Claims
        Based on their post-trial discovery of additional
impeachment evidence concerning two of the government's witnesses,
appellants moved for a new trial.  The district court denied the
motions, which Famania claims was an abuse of discretion.  We
disagree.
        The denial of a motion for a new trial is reviewed only
for manifest abuse of discretion.  United States v. Henry, 136 F.3d
12, 22 (1st Cir. 1998).
        A.  Nancy Muiz
        At trial, one of the government's witnesses, Nancy Muiz,
claimed that she was employed as a financial consultant at Merrill
Lynch.  After trial, this testimony was discovered to be false;
Muiz was in fact making her living as a prostitute.  The district
court found that "[t]here is no suggestion that the government was
aware of Ms. Muiz's perjury."  July 22, 1997, Mem. and Order at 3.  
Subsequent to the trial, and allegedly unbeknownst to the
prosecution, appellant ascertained that the Framingham police had
charged Muiz with operating a motor vehicle without a license, a
charge which was pending at the time of her testimony.  See id. at
1.
        We begin by noting the relevant legal standards.  A Bradyerror occurs when the prosecution suppresses "material" evidence
that is favorable to the accused.  See Kyles v. Whitney, 514 U.S.
419 (1995).  In most circumstances, exculpatory evidence is
material only if there is a "'reasonable probability that, had the
evidence been disclosed to the defense, the result of the
proceeding would have been different.'"  Id. at 435 (quoting United
States v. Bagley, 473 U.S. 667, 682, 685 (1985)).  We refer to this
as the Bagley standard.
        A standard of materiality more favorable to the defendant
applies, however, when previously undisclosed evidence reveals that
the prosecutor knowingly used perjured testimony or, equivalently,
knowingly failed to disclose that testimony used to convict the
defendant was false.  See Bagley, 473 U.S. at 678-80.  In such
situations, "'a conviction . . . is fundamentally unfair, and must
be set aside if there is any reasonable likelihood that the false
testimony could have affected the judgment of the jury.'"  Kyles,
514 U.S. at 433 n.7 (quoting United States v. Augurs, 427 U.S. 97,
103 (1976)).  We refer to this as the Augurs standard.
        Here, the district court assumed that the government
"should have known" about Muiz's perjury, and applied the Augursstandard of materiality.  See July 22, 1997 Mem. and Order at 3.  
Applying this standard, it found that "there is no reasonable
possibility that one more piece of impeaching evidence tarnishing
an already blemished witness by degree rather than kind, could have
affected the jury's judgment."  Id. at 4.  With regard to the
traffic citation, the district court found that it was not Bradymaterial.  See id. at 5.  Applying the Kyles/Bagley materiality
test, the court found that had the jury been made aware of the
infraction, "there is no reasonable possibility, much less a
probability," id., that it would have influenced the verdict.
        The district court's rulings were not an abuse of
discretion.  Muiz admitted to the jurors that she had supported a
thirteen-year addiction to heroin by working as a prostitute, that
she had frequently used other illegal drugs, that she had offered
herself to the government as an informant because she needed the
money, and most importantly, that she had lied to the grand jury
about having been a prostitute in the past.  The jury was already
on notice about her tendency to commit perjury.  
        In addition, the thrust of her testimony, that defendants
Rodrguez, Rosario and Famania were in the business of distributing
crack cocaine, was corroborated by the testimony of five other
cooperating witnesses, and by police surveillance and physical
evidence.  Even examining her perjury under the Augurs standard,
there is little chance that her false testimony affected the
verdict.
        Similarly, the district court's ruling with respect to
the traffic citation does not constitute an abuse of discretion.  
Assuming arguendo, but with little basis in the record, that the
prosecutors or their agents knew or should have known of the
information in question, we agree with the district court that
there is no reasonable possibility that their lack of awareness of
a traffic citation would have influenced their verdict.  See United
States v. Seplveda, 15 F.3d 1216, 1220 n.5 (1st Cir. 1993)("[O]ur
decisions . . . have [not] been sympathetic to new trial claims
based solely on the discovery of additional information useful for
impeaching a government witness.").
        B.  Pedro De Jess
        Defendants argue that they were not told about the
government's notice to De Jess under 21 U.S.C.  851, which
exposed De Jess to harsh recidivist penalties, enhancing his
"motivation to tell the government what it wanted to hear."  Def.
Br. at 26.
        The government's nondisclosure of its  851 filing does
not entitle the defendants to a new trial.  Defendants knew full
well that De Jess had a long criminal history, see Tr. 10/17 at
21-23 (Rodrguez's cross-examination detailing De Jess' prior
convictions), and that a  5K1.1 motion would trump any mandatory
sentence that De Jess would otherwise receive.  As a result, there
is no Brady violation.  See United States v. Hicks, 848 F.2d 1, 4
(1st Cir. 1988).  The government has no Brady burden when the
necessary facts for impeachment are readily available to a diligent
defender, as they were here.  See Lugo v. Muoz, 682 F.2d 7, 9-10
(1st Cir. 1982).
        Further, the government's failure to disclose its promise
to apprise state law enforcement authorities about De Jess'
cooperation does not entitle the defendants to a new trial.  At
trial, there was confusion about the status of De Jess' state drug
charges.  The court initially told the jury that state court
records indicated that De Jess had already pled guilty and been
sentenced to probation on drug-trafficking charges.  After further
investigation, it was discovered that the charges were still
pending.  As a result, the court corrected the factual inaccuracy
and specifically instructed the jury that
        you may consider whether any expectancy of
        leniency on this pending [state] charge might
        have had an influence on what he said when [De
        Jess] testified before you.

Tr. 10/21 at 117.  This charge, along with the extensive cross-
examination conducted by the defendants concerning De Jess'
alliance with the government and his motivation for a reduced
sentence, rendered the government's failure to disclose its aid to
De Jess insignificant.
V.  Request for an Evidentiary Hearing
        Appellants argue that the district court erred in
refusing their request for an evidentiary hearing to determine
whether Muiz perjured herself on matters other than her
occupation, and to discover whether the government had disclosed
all of its pretrial promises and inducements to Carvajal and De
Jess.  We are not persuaded.
        The substantive test to be applied when a criminal
defendant seeks an evidentiary hearing is whether the movant has
made an adequate threshold showing that the material facts are in
genuine doubt or dispute.  See United States v. Lilly, 983 F.2d
300, 311 (1st Cir. 1992).  If the district court declines to hold
an evidentiary hearing, we will disturb its decision only for an
abuse of discretion.  See id.
        Appellants argue that Muiz's "lie about her employment
was not likely her only lie about herself."  Def. Br. at 38.  They
speculate that her prostitution "clearly suggested that she was
hardly a recovered heroin addict."  Id.  However, they offered no
evidence to support their theories, and the district court rejected
their request for an evidentiary hearing.
        With regard to the issue of the government's pre-trial
promises and inducements, the district court ordered the government
to file a declaration stating that it had disclosed all inducements
given to cooperating witnesses.  In response, the government
represented that all pre-trial promises, rewards, and inducements
had been disclosed.  In its final order denying an evidentiary
hearing, the court stated:
        [I]n the absence of any evidence to the
        contrary, I accept the government's
        representation . . . that it has disclosed all
        such inducements.

June 5, 1998 Order at 1.   
        As this Court has stated in the past, "[a] criminal
defendant has no constitutional right to conduct a fishing
expedition."  Lilly, 983 F.2d at 311.  Appellants have made no
showing, in this Court or below, that material facts were in doubt
or dispute.  Conclusory allegations and pure speculation, without
more, do not merit an evidentiary hearing.  Accordingly, the
district court acted well within its discretion when it denied the
appellants' request.
VI. Challenge to the Composition and Voir Dire Examination of
   the Jury

        Rosario contends: (1) that the district court wrongly
rejected his challenge to the grand and petit jury venires on the
ground of systematic exclusion of Hispanics; and (2) that the court
violated his due process and fair trial rights by denying his
motion to directly question the venire.  Neither claim is
compelling.
        A.  Systematic Exclusion Claim
        At base, Rosario's argument is that the dissent in United
States v. Pion, 25 F.3d 18 (1st Cir. 1994)(rejecting an attack on
the composition of juries in the district court of Massachusetts
based on under-representation of the Hispanic population), was
correct.  He offers nothing new in the way of statistics or legal
authority to buttress his claim.  Nor does he provide any reason
why we should reconsider our recent reaffirmation of Pion in United
States v. Lpez, 147 F.3d 1 (1st Cir. 1998).  Consequently, there
is no need to go any further.   
        B.  Voir Dire Claim
        Fed. R. Crim. P. 24(a) provides that the trial court may
decide to conduct the voir dire itself or may allow the parties to
conduct it.  See Rosales-Lpez v. United States, 451 U.S. 182
(1981); Fed. R. Crim. P. 24(a).  Rosario argues, contrary to the
language of Rule 24(a), that due process requires that he should
have been allowed to question the venire.
        There is simply no authority, as Rosario himself admits,
for the proposition that defense counsel must be allowed -- as a
matter of right -- to question the venire.  Rather, the law states
that the trial court has the option of allowing counsel to conduct
voir dire or conducting the examination itself.  If the court
chooses the latter option, as it did in this case, it must permit
counsel to "supplement the examination by such further inquiry as
it deems proper or shall itself submit to the prospective jurors
such additional questions by the parties or their attorneys as it
deems proper."  Fed. R. Crim. P. 24(a).
        The trial court complied with the requirements of Rule
24(a) by asking the venire, at defense counsel's request, about
their possible prejudices against Hispanics.  See Tr. 10/7 at 18.  
After noting that the law enforcement officials would all be
Caucasians, the district court additionally asked whether any juror
would be inclined to take the word of a white police officer over
a Hispanic defendant, or otherwise give "some edge" to the
officer's testimony.  See id. at 19.  Accordingly, the court's
conduct of voir dire was entirely proper.
VII.  Sentencing Issues
        Famania and Rosario challenge their sentences on numerous
grounds.  None is convincing and all are thus rejected.
        A.  The Sentences
        A narcotics conspirator is responsible not only for drugs
he actually handled or saw but also for the full quantity of drugs
that he reasonably could have foreseen to be embraced by the
conspiracy he joined.  See United States v. De La Cruz, 996 F.2d
1307, 1314 (1st Cir. 1993); U.S.S.G.  2D1.4, 2D1.1, 1B1.3 &
comment n.1.  The district court's findings as to the quantity
embraced by the conspiracy and reasonably foreseen by the defendant
is a factual one and will not be disturbed unless clearly
erroneous.  See De La Cruz, 996 F.2d at 1314.
        Where no drugs have been seized, the guidelines instruct
the district court to approximate the amounts involved, seeU.S.S.G.  2D1.1 comment. (note 12), and we uphold such an
approximation as long as it represents a reasoned estimate of the
quantity.  See United States v. Webster, 54 F.3d 1, 5 (1st Cir.
1995).
        First, the district court found that Rodrguez, Rosario,
and Famania had joined the conspiracy by December 1994, and that
the conspiracy continued until Rodrguez's arrest in September
1995.  See Tr. 7/11/97 at 7.  Second, it found that "a fair and
conservative figure would attribute the distribution of five ounces
of crack cocaine to the conspiracy on a weekly basis."  Id. at 9.  
Over a 36-week period, that would involve the distribution of
approximately 5,000 grams of crack cocaine.   
        The district court based its approximation on the
following factors: (1) the ability of the conspirators to produce
crack cocaine on short notice in amounts ranging from 13 grams to
an ounce; (2) the four undercover purchases; (3) Carvajal's
testimony that he and Rodrguez agreed to the purchase of an ounce
of crack weekly on consignment; (4) numerous eyewitness accounts
and surveillance of the come-and-go traffic at Famania's apartment
and at Beaver Park; and (5) accounts of the conspiracy's customers.  
See id. at 9-10.
        All three defendants were assigned a Base Offense Level
("BOL") of 38.  See id. at 10.  With no adjustments to the BOL and
based on a Category II criminal history, the district court
sentenced Rosario to 262 months, the lowest end of the applicable
262-327 months range.  See id. at 11.  It sentenced Famania to 235
months imprisonment, the minimum of the 235-293 month range, again
with no adjustments to the BOL and based on a Category I criminal
history.  See id. at 12.
        The district court's approximation was a reasoned, if not
conservative, estimate of the drug quantity involved.  
Consequently, the sentences imposed were proper and without error.
        B.  Denial of an Evidentiary Hearing
        Contrary to Famania's claim, the district court did not
err in making its drug quantity calculations without first holding
an evidentiary hearing.
        Under the federal sentencing guidelines, "when any factor
important to the sentencing determination is reasonably in dispute,
the parties shall be given an adequate opportunity to present
information to the court regarding that factor."  U.S.S.G.  6A1.3.  
This provision does not mean that every factual dispute pertinent
to the imposition of sentence demands a full evidentiary hearing.  
See United States v. Robles-Torres, 109 F.3d 83, 85 (1st Cir.
1997).  Evidentiary hearings at sentencing are, and should remain,
the exception rather than the rule.  See id.  In the final
analysis, the decision to hold or eschew an evidentiary hearing
lies within the sound discretion of the sentencing court.  See id.  
        In his request for an evidentiary hearing, Famania
proposed to take the stand and refute various pieces of trial
testimony, and also to cross-examine Carvajal.  In denying the
request, the district court noted: (1) that Carvajal was vigorously
cross-examined at trial; (2) that the court had an opportunity to
assess Carvajal's credibility; and (3) that the defendants had
offered nothing of substance to impugn the specifics of Carvajal's
account.
        The district court indicated that it would consider any
relevant affidavits or statements submitted by appellants for
sentencing purposes.  Taking his cue from the district court,
Famania submitted an affidavit disputing the trial testimony of
Carvajal, De Jess, and Muiz, as well as the grand jury testimony
of another witness describing Famania as a drug distributor.  He
also presented an affidavit from one of his sisters-in-law, who
attested that Famania's large family had free access to his
apartment, and that they did not witness any drug activity.
        Not satisfied with the above, Famania now attacks his
sentence on the basis that the defendants were entitled to an
evidentiary hearing: (1) to further the fact-finding process; and
(2) to combat the government's proffer and the court's reliance on
the grand jury testimony of a witness who corroborated trial
testimony as to the nature of the conspiracy.
        Famania's arguments are not well founded.  Under U.S.S.G.
6A1.3, he was given his proverbial day in court when the district
court invited the submission of affidavits and statements by the
defendants for sentencing purposes.  Given that opportunity to
present information to the court, the district court's decision not
to hold an evidentiary hearing was not in error.   
        Moreover, a "sentencing judge is vested with wide
discretion to determine the information on which sentencing
guideline decisions will be based, and may consider reliable
hearsay evidence."  United States v. Montoya, 967 F.2d 1, 3 (1st
Cir. 1992) (citation omitted).  Evidence with "sufficient indicia
of reliability to support its probable accuracy" may be considered
at sentencing "without regard to its admissibility under the rules
of evidence applicable at trial."  U.S.S.G.  6A1.3.  Mindful of
these tenets, the district court's consideration of grand jury
testimony to corroborate the general nature of the conspiracy was
entirely proper.
        C.  Disparate Sentencing/Prosecutorial Discretion Claim
        Defendants Rosario and Famania argue that they should be
resentenced because their sentences were significantly higher than
those of their co-conspirators who pled guilty rather than choosing
to go to trial.  They claim that the disparity in sentencing
constituted an impermissible burden on their Sixth Amendment right
to a jury trial and violated the Due Process and Equal Protection
Clauses of the Constitution.
        The government indicted six defendants, charging all of
them with engaging in the same conspiracy to distribute crack
cocaine.  The district court found this conspiracy accountable for
the distribution of approximately 5,000 grams of crack cocaine over
a 36-week period.  At sentencing, the court held Rosario and
Famania accountable for all 5,000 grams of the crack cocaine.  In
contrast, the district court accepted the agreement of the three
defendants who had pled guilty -- Carvajal, De Jess, and Villafae
-- which was based on responsibility only for the amount of drugs
which each had personally handled.  Carvajal, for example, was held
accountable for 5 to 20 grams of crack cocaine.  This disparity in
the drug-quantity attribution led to an even more striking
disparity in sentencing, which is the subject of the defendants'
complaint.  Carvajal was sentenced to the time he had already
served, De Jess to 17 months of imprisonment, and Villafae to 60
months of imprisonment.  Famania was sentenced to 235 months of
imprisonment, and Rosario to 260 months of imprisonment.  
Rodrguez, who was also charged with engaging in a continuing
criminal enterprise, was sentenced to life imprisonment.
        The thrust of the defendants' complaint is that this vast
disparity in sentencing -- a difference of more than 21 years
between Carvajal and Rosario, for example -- is an inevitable
consequence of the application of a different drug-quantity
attribution algorithm for those defendants who plead guilty as
opposed to those who did not.  They identify the plea-bargaining
practice of the Office of the United States Attorney as the source
of this disparity.  The defendants claim that the U.S. Attorney
fashioned plea agreements with the "pleading defendants" which
attributed to them an amount of drugs no greater than the amount
for which the pleading defendants were personally responsible, or
had personally handled.  Those who did not plead guilty but
exercised their right to go to trial, by contrast, had attributed
to them all of the drugs that could be accounted to the entire
conspiracy.  Those who chose to go to trial, therefore, were
necessarily sentenced on the basis of a far greater amount of drugs
than those who pled guilty.  According to the defendants, this
practice discriminates against those who exercise their right to a
jury trial.
        The government, which characterizes the defendants'
argument as an improper motion for a downward departure from the
applicable sentencing range, argues that we have no jurisdiction to
consider the defendants' complaint because the disparate sentences
of co-conspirators do not provide a basis for resentencing.  The
government further asserts that even if this court did have
jurisdiction, it should find no constitutional violation because
the sentences of the pleading defendants were properly based on
their plea agreements and allowed by U.S.S.G.  1B1.8(a).
        We begin, as we must, with the government's
jurisdictional objection.  It is settled that "we have no appellate
jurisdiction to review a sentence within the applicable sentencing
guidelines range if that range was correctly determined."  United
States v. Panet-Collazo, 960 F.2d 256, 261 (1st Cir. 1992).  The
defendants' argument is focused on the argued unconstitutional
effects of the practices that led to the imposition of such
disparate sentences.  They do not say that their sentences were
improperly calculated.  Instead, they claim that the plea-
bargaining practice of the U.S. Attorney's Office puts undue
pressure on defendants, such as Rosario and Famania, to waive their
right to a trial and violates Due Process and Equal Protection
principles.  Because there is no jurisdictional barrier to such an
argument, we evaluate the defendants' argument.
        The defendants' challenge to the plea-bargaining practice
of the U.S. Attorney here finds little support in the law.  We
begin by noting that "prosecutorial charging, plea, and motion
practices are . . . a well-spring of sentencing disparity . . . .
In the federal system, prosecutors have always enjoyed great
discretion in deciding what cases to pursue and what charges to
bring."  Kate Stith & Jos A. Cabranes, Fear of Judging: Sentencing
Guidelines in the Federal Courts 140-41 (1998).  As Professor Stith
and Judge Cabranes state:
          The major reason that such broad
        [prosecutorial] discretion has been accorded
        to prosecutors is the large number and
        complexity of factors that prosecutors must
        (legitimately) take into account in making
        charging and other decisions.  These include
        many considerations that the Sentencing
        Guidelines, or any other sentencing authority,
        would recognize as relevant also to
        sentencing--including the nature and
        seriousness of the offense, the deterrent
        effect of prosecution, the defendant's
        culpability in the offense, the defendant's
        criminal history and a wide range of other
        personal circumstances, the charges against
        accomplices in the crime, and the defendant's
        willingness to cooperate in the prosecution of
        others.  In addition, prosecutors must pay
        attention to a variety of considerations that
        sentencing authorities ordinarily do not take
        into account after the defendant has been
        convicted--the strength or paucity of the
        admissible evidence, the priority accorded by
        the federal government as well as by the local
        community to prosecution of the particular
        offense, the capability and availability of
        prosecutorial resources and adjunct
        investigatory resources, the alternatives to
        prosecution, and the likelihood of prosecution
        in another jurisdiction.

Id. at 141.
        The government, it appears, negotiated plea bargains with
some of the defendants and promised, according to U.S.S.G.
1B1.8(a), not to use any of the information provided by
cooperating defendants against them.  The government then charged
each of them only with the amount of drugs they had personally
handled, rather than the entire amount distributed by the
conspiracy.  This practice led to the enormous sentencing disparity
for the defendants who chose to put the government to its burden in
proving its case.  Nevertheless, the law allows the government to
do this, even if it results in sentences of such disparity as would
strike many as unfair.
         The fact that those who plead generally receive more
lenient treatment, or at least a government recommendation of more
lenient treatment than co-defendants who go to trial, does not in
and of itself constitute an unconstitutional burden on one's right
to go to trial and prove its case.  See Corbitt v. New Jersey, 439
U.S. 212, 219 (1978) (noting that every burden on the exercise of
a constitutional right is not invalid and that there is no per se
rule against encouraging guilty pleas, even where those pleas
promise the certainty of a lesser penalty).  To be sure, the
differential which resulted here exacts a high price from those who
exercise their constitutional right to trial, but the price is not
high enough to constitute a constitutional violation.   
         Corbitt provides guidance on this issue.  In Corbitt, the
Court addressed a claim under the New Jersey homicide statutes,
which mandated life imprisonment for a jury conviction of first-
degree murder and a maximum term of 30 years' imprisonment for a
jury conviction of second-degree murder.  Although guilty pleas
were not permitted in murder cases, a plea of non vult (or nolocontendere) was allowed.  If such a plea was accepted, the judge
would not need to decide whether the murder was first- or second-
degree, but could sentence the defendant to either life
imprisonment or to the same sentence that would be imposed for
second-degree murder (i.e., a maximum of 30 years' imprisonment).  
See id. at 214-15.  The Court rejected the claim that because a
plea of non vult might produce a lesser sentence than going to
trial, the statutes imposed an unconstitutional burden on the
defendant's right to a jury trial and violated his right to equal
protection under the laws.  See id. at 218.  The Court, quoting its
earlier decision in Bordenkircher v. Hayes, 434 U.S. 357 (1978),
explained that:
         While confronting a defendant with the risk of
         more severe punishment clearly may have a
         discouraging effect on the defendant's
         assertion of his trial rights, the imposition
         of these difficult choices [is] an inevitable
           and permissible   attribute of any
         legitimate system which tolerates and
         encourages the negotiation of pleas.  It
         follows that, by tolerating and encouraging
         the negotiation of pleas, this Court has
         necessarily accepted as constitutionally
         legitimate the simple reality that the
         prosecutor's interest at the bargaining table
         is to persuade the defendant to forgo his
         right to plead not guilty.

Corbitt, 439 U.S. at 220-21 (quoting Bordenkircher, 434 U.S. at
364) (internal quotation marks and citation omitted).  The Court
also indicated that the defendant's reliance on United States v.
Jackson, 390 U.S. 570 (1968), was inapposite.  See Corbitt, 439
U.S. at 216-17.
         In Jackson, the Court found that one portion of the
Federal Kidnapping Act, 18 U.S.C.  1201(a), needlessly chilled the
exercise of one's right to a jury trial.  See Jackson, 390 U.S. at
582.  Corbitt distinguished Jackson, and thus its rule, on several
grounds.  Jackson involved the death penalty, "which is unique in
its severity and irrevocability."  Corbitt, 439 U.S. at 217
(quoting Gregg v. Georgia, 428 U.S. 153 (1976)).  The pressures in
Corbitt, which compared to those stemming from the practice alleged
here, were substantial, but they did not rise to the level of those
in Jackson.  See id. at 217 (declining to hold "that the Jacksonrationale is limited to those cases where the plea avoids any
possibility of the death penalty's being imposed," but noting that
"it is a material fact that under the New Jersey law the maximum
penalty for murder is life imprisonment, not death").
         Further, in Jackson, all risk of receiving the death
penalty could be avoided by pleading guilty.  In Corbitt, although
the punishment for a jury conviction of first-degree murder was
life imprisonment, the risk of receiving the same punishment was
not completely avoided by pleading non vult, as the judge accepting
the plea still maintained the power to impose a life term.  SeeCorbitt, 439 U.S. at 217.  The defendants here, of course, cannot
avoid the imposition of a significantly greater sentence without
pleading guilty, but that fact alone cannot help these defendants
to avoid Corbitt and bring their case within the ambit of Jackson.
         The defendants do not dispute that a conspirator may be
held responsible for the reasonably foreseeable amount of drugs
embraced by the jointly undertaken activity.  See De La Cruz, 996
F.2d at 1314.  It is, however, within the government's discretion
to charge similarly situated defendants differently.  Only when a
prosecutor discriminates against defendants based on impermissible
criteria such as race or religion is a prosecutor's discretion
subject to review and rebuke.  See Bordenkircher, 434 U.S. at 364
(noting that "the conscious exercise of some selectivity in
enforcement is not in itself a federal constitutional violation so
long as the selection was [not] deliberately based upon an
unjustifiable standard such as race, religion, or other arbitrary
classification") (internal quotation marks omitted); cf. Corbitt,
439 U.S. at  225-26 (holding that there was no Equal Protection
violation where those who pled guilty could potentially serve the
same sentence as those who chose to contest their guilt, and
asserting that to "fit the problem . . . into an equal protection
framework is a task too Procrustean to be rationally accomplished")
(citation omitted).   
         To the extent that the defendants' argument can be
characterized as seeking to equalize their sentences with those of
their co-defendants, their argument, "without more, will not permit
a departure from a properly calculated guideline sentencing range."  
United States v. Wogan, 938 F.2d 1446 (1st Cir. 1991); see United
States v. Pierro, 32 F.3d 611, 622 (1st Cir. 1994)(same); United
States v. Figueroa, 976 F.2d 1446, 1460 (1st Cir. 1992); United
States v. Butt, 955 F.2d 77, 90 (1st Cir. 1992); see also United
States v. Jackson, 950 F.2d 633, 637-38 (10th Cir. 1991) ("Because
Jackson's claim is based solely on the lesser sentence imposed on
his codefendant and because his sentence falls within the range
established by the Sentencing Guidelines, we must reject this claim
. . . ."); United States v. Carpenter, 914 F.2d 1131, 1136 (9th
Cir. 1990) (holding that a defendant cannot base a challenge to his
sentence solely on the lesser sentence given by the district court
to his codefendant); United States v. Guerrero, 894 F.2d 261, 267
(7th Cir. 1990) (stating that there is nothing "in the legislative
history suggesting that the sentences within the Guidelines should
be reviewed because of a claim that a particular sentence is
draconian or too lenient"); United States v. Snchez-Sols, 882
F.2d 693, 699 (2d Cir. 1989) (rejecting defendant's claim that a
disparity in sentences violates the Sentencing Reform Act and
rejecting his suggestion that he was penalized for exercising his
right to a trial).  
                          CONCLUSION
         For the reasons stated in this opinion, we affirm.

</body>

</html>